CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUN 26 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **MICHAEL W. CHILDRESS,** | )<br>) |
| Plaintiff, | )<br>)  Civil Action No. 1:05cv00055<br>) |
| v. | )<br>)  **MEMORANDUM OPINION**<br>) |
| **JO ANNE B. BARNHART,**<br>**Commissioner of Social Security,** | )<br>)  By: GLEN M. WILLIAMS<br>)  SENIOR UNITED STATES DISTRICT JUDGE<br>) |
| Defendant. | )<br>) |

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Michael W. Childress, ("Childress"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Childress's claims for a period of disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 and Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Childress filed his current applications for DIB and SSI on or about March 1, 1999, alleging disability as of September 29, 1998, due to blackouts, severe headaches, diziness, severe panic attacks, head problems, difficulties breathing and pain in his back. (Record, ("R.") at 111-18, 120, 663-68.) His claim was denied initially and on reconsideration. (R. at 76-77, 78-81, 669, 672.) Childress then requested a hearing before an administrative law judge, ("ALJ"). (R. at 82-83.) The ALJ held a hearing on December 1, 1999, at which Childress was represented by counsel. (R. at 675-702.) On November 3, 2000, the ALJ issued a decision and denied Childress benefits. (R. at 51-62.) Childress then requested that the ALJ's decision be reviewed by the Appeals Council, and the Appeals Council remanded the case back to the ALJ. (R. at 97-99.) A second hearing was held on April 29, 2004, (R. at 703-730), and by decision dated May 14, 2004, the ALJ again denied Childress's claims for SSI and DIB benefits. (R. at 15-35.)

In his opinion dated May 14, 2004, the ALJ found Childress met the

nondisability requirements for a period of disability and DIB and was insured for benefits through December 31, 2003. (R. at 34.) The ALJ found that Childress was a younger individual[1], who had a limited education with no transferable skills from past relevant work. (R. at 34.) The ALJ determined that Childress had not engaged in any substantial gainful activity since the alleged onset date of disability. (R. at 34.) The ALJ found that Childress had an impairment or a combination of impairments considered "severe" based on the requirements of 20 C.F.R. §§ 404.1520(c) and 416.920(c). (R. at 34.) However, the ALJ found that Childress did not have a medically determinable impairment that met or medically equaled one of the listed impairments found in 20 C.F.R., Part 404 Appendix 1, Subpart P, Regulation No. 4. (R. at 34.) The ALJ found Childress's allegations only partially credible. (R. at 34.) After carefully considering all of the medical opinions in the record regarding the severity of Childress's impairments, the ALJ determined that Childress had the residual functional capacity for simple, repetitive, light exertional work that did not require lifting objects weighing greater than 20 pounds occasionally and 10 pounds frequently. (R. at 34.) The ALJ, thus, concluded that Chilldress had the residual functional capacity to perform a significant range of light work. (R. at 34.) The ALJ found that Childress was capable of performing his past relevant work as a molding machine operator. (R. at 34.) Based on Childress's age, education and residual functional capacity and the testimony of a vocational expert, the ALJ also found that there were numerous other jobs in the national ecomony that Childress was capable of performing. (R. at 34.)

---

[1]A claimant between the ages of 19 and 49 years of age is considered a "younger individual." 20 C.F.R. §§ 404.1563(c) and 416.963(c) (2005).

-3-

After the ALJ issued his opinion, Childress pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 10-13.) Childress then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). This case is before the court on the Commissioner's motion for summary judgment, filed February 14, 2006, (Docket Item No. 13), and Childress's motion for summary judgment, (Docket Item No. 10), filed December 20, 2005.

## II. Facts

At the time of the hearing, Childress was 36 years old, which classified him as a "younger individual" under 20 C.F.R. §§ 404.1563(c) and 416.963(c). (R. at 706.) Childress had a tenth-grade education and past relevant work experience as a carpenter and coal miner. (R. at 707.)

During the hearing on April 29, 2004, the ALJ commenced with questions regarding Childress's past work. (R. at 707.) Childress testified that he last worked in 1989 as a carpenter. (R. at 707.) He said carpentry required him to saw, lift and nail lumber ranging in size from two-by-fours to two-by-sixes. (R. at 707.) Childress also testified that he had worked in the coal mining industry for three and a half to four years, where he had performed a variety of jobs. (R. at 707.) He further testified that he had worked in a factory called Tail Flakes for approximately a year. (R. at 708.) At Tail Flakes, he ran a machine that made brake cables, and this work required constant standing. (R. at 708.) The ALJ then asked if the previous jobs required much lifting, and Childress answered affirmatively. (R. at 708.) Childress

-4-

stated that the job at Tail Flakes required him to lift boxes that weighted approximately 80 to 100 pounds. The only other past relevant work that Childress testified to was as a mechanic, where he changed oil in vehicles. (R. at 708.)

The ALJ next asked Childress why he could not work. (R. at 708.) Childress answered that he hurt all of the time, and he stayed sick to his stomach. (R. at 708.) He stated that he suffered from chronic pancreatitis that flared up two or three times a day and caused pain for which, he could not find relief. (R. at 709.) He also testified that his stomach and liver swelled. (R. at 709.)

Childress testifed that he took Oxycontin and Lortab for pain. He stated that he took Phenergan for his upset stomach. (R. at 710.) Childress testifed that he also took medicine for his nerves, high blood pressure and depression. (R. at 710.) The ALJ asked if there were any side effects caused by the medication, and Childress answered that he was sleepy all the time. (R. at 710.) The ALJ next asked if there were any other health problems that Childress suffered from that he had not mentioned. (R. at 710.) Childress said that he had a cyst in his sinuses, which caused him significant sinus trouble. (R. at 710.)

The ALJ next asked Childress what was the duration that he could stand on his feet. (R. at 710.) Childress answered that he could stand for a few minutes and then he becomes nauseated and vomits. (R. at 710-11.) He further stated that he becomes nauseated and vomits twice a day. (R. at 711.) Childress testified that bending, crouching, crawling, lifting and squatting aggravates his stomach. (R. at 711.) When asked about his swelling hands, Childress stated that when they were swollen he had

-5-

limited use because they became real tight. (R. at 711.) He also stated that he had trouble sleeping through the night because of pain. (R. at 711.)

Childress testified that he had no hobbies and that he usually just watched TV. (R. at 712.) He said that his wife and children did the housework, and his son did the yard work. (R. at 712.) Childress stated that he was unable to leave the house because of severe diarrhea. (R. at 712.) He testified that he experienced anywhere from five to six diarrhea episodes everyday. (R. at 712.)

The ALJ asked Childress about his pain medication. (R. at 712.) Childress testified that he took his pain medicine when he woke up in the morning. (R. at 712.) He said that it took approximately 30 minutes to relieve his pain. (R. at 712.) Childress said that the Oxycontin was effective at controlling his pain for three hours, and then he would take another pill. (R. at 712.) He said that when the Oxycontin was not relieving his pain, he would take a Lortab, which would then provide pain relief. (R. at 712.) However, Childress testified that his medications affected his ability to concentrate, focus and stay on task because he was constantly sleepy, but his medications did not affect his memory. (R. at 713.)

Childress next testified that he experienced anxiety and depression, due to his condition. (R. at 713.) He said that he was nervous all of the time and that he was very irritable. (R. at 713.) Childress was distressed by the fact that he could not help out with house or yard work. (R. at 713.)

Dr. Edward Griffin, M.D., medical expert was next called to testify. (R. at

-6-

714.) Griffin stated that he had reviewed the medical record and exhibits. (R. at 714.) The ALJ then asked Griffin if he had an opinion as to the severity of Childress's impairments. (R. at 714.) Griffin testified Childress did not have any severe impairments that met or equaled a listing. (R. at 714.) Griffin stated that he did not believe that Childress suffered from chronic pancreatitis because Childress had not lost weight, rather he had gained weight, which, in Griffin's opinion, weighed heavily against the possibility that Childress suffered from pancreatitis. (R. at 714.) Griffin testified that weight loss was a pathologic finding in chronic pancreatitis. (R. at 714.) Griffin stated that further adding to the unlikelihood that Childress had chronic pancreatitis, was the fact that Childress did not have any of the chronic stipple calcifications in the pancreatic bed that would be seen with chronic pancreatitis. (R. at 714.) Griffin testified that he could not accept the diagnosis of chronic pancreatitis becuase of Childress's 15-plus pound weight gain. (R. at 714.) Griffin concluded by stating that Childress did not have objective medical evidence of chronic pancreatitis. (R. at 716.)

Griffin noted that Childress had seen Dr. Patel, who treated Childress for headaches. (R. at 715-16.) Griffin opined that the headaches would not limit Childress, and he further pointed out that treatment for the headaches almost ceased after 1999, and then he was only treated for a very brief interval of time. (R. at 715-16.) The ALJ asked Griffin what limitations he would place on Childress. (R. at 716.) Griffin testified that due to Childress's medications he should avoid jobs that required alertness and more than simple concentration. (R. at 716-17.) He further stated that the exertional limitations on Childress would be light work. (R. at 717.)

-7-

Thomas Schacht, Ph.D., medical expert, was the next witness to testify. (R. at 717.) The ALJ asked Schacht if Childress had a severe psychological impairment that either met or equaled one of the listed impairments or one that would cause work-related restrictions. (R. at 718.) Schacht testified that Childress could perform simple, repetitive jobs that needed little concentration. (R. at 722.) Schacht testified that Childress would probably have mental capabilities in the mid to high level at the borderline range. (R. at 719.) Schacht noted that Childress' mental evaluations were somewhat inconsistent and believed the reason for this was that Childress had malingered. (R. at 721.) Further, Schacht questioned a unexplained 10-point drop in Childress's IQ score and questioned Lanthorn's credibility after noting the inconsistencies in Lanthorn's testing. (R. at 721.)

Cathy Sanders, vocational expert, was next called to testify at the hearing. (R. at 726.) The ALJ asked Sanders to assume Childress had a limited education, with mid to high borderline intelligence, was restricted to simple repetitive work requiring lifting object weighing 20 pounds infrequently and objects weighing 10 pounds frequently. (R. at 727.) Based on that assumption, the ALJ asked Sanders if there were jobs Childress could perform in the regional economy. (R. at 727.) Sanders testified that there were 4,450 jobs regionally and 1,170,000 jobs nationally, which Childress could perform. (R. at 727.) She then listed the following jobs: salad preparation, sorter, bagger, machine tender, off bearer and hand packer. (R. at 727.)

In rendering his decision, the ALJ reviewed records from Dr. Vinod Modi, M.D.; Dr. Steven W. Morgan, M.D.; Dr. Mrugendra R. Patel, M.D.; Buchanan General Hospital; Dr. David L. Forester, M.D.; Dr. Tushar G. Patel, M.D.; Dr. Jeffery

-8-

S. Levin, M.D.; Dr. Bassel Shneker, M.D.; Dr. E. Clarke Haley, M.D.; Dr. Eugene McClintic, M.D.; Dr. Michael Speal, M.D.; Dr. Zaven Jabloerian, M.D.; Duke University Medical Center; Dr. Malcolm Branch, M.D.; Dr. Stanley Branch, M.D.; Clinch Valley Medical Center; Bristol Regional Medical Center; Russell County Medical Center; B. Wayne Lanthorn, Ph.D.; Dr. D.M. Aguirre, M.D.; Tonya McFadden, MA; Dr. German Iosif, M.D., state agency physician; Sharon J. Hughson, Ph.D.; Dr. Jeffery S. Levine, M.D.; Hugh Tenison, Ph.D., state agency phychologist; and Howard Leizer, Ph.D. state agency psychologist.

Childress was treated by Dr. Vinod Modi, M.D., from August 22, 1996, until May 10, 1999. (R. at 201-11.) During this time period, Childress presented to Dr. Modi the following symptoms: nervousness, depression, heart burn, smothering, headaches, wheezing, coughing, dizziness, sinus congestion and low back pain. (R. at 201-11.) After each visit, Dr. Modi's treatment records indicated that he prescribed appropriate medications for Childress' symptoms. (R. at 201-11.)

Dr. Modi referred Childress to a neurologist, Dr. Steven W. Morgan, M.D. (R. at 216.) Dr. Morgan sent Dr. Modi a letter regarding his treatment of Childress on November 17, 1998. (R. at 216.) In the letter Dr. Morgan noted that Childress had some tenderness along the base of his skull. (R. at 216.) His impression was that Childress possibly suffered from cervical headaches. (R. at 217.) In a letter dated December 21, 1998, Dr. Morgan believed that Childress' subjective symptoms sounded more like migraine or vascular headache symptoms than the cervical headache symptoms that Childress had previously described. (R. at 215.)

-9-

On January 22, 1999, Childress presented to Dr. Mrugendra R. Patel, M.D., with complaints of headaches and dizziness. (R. at 222.) This appointment was a self referral. (R. at 222.) Dr. Patel administered an EEG on Childress. (R. at 223.) The EEG results were normal. (R. at 223.)

Childress was admitted to the Buchanan General Hospital on March 2, 1999. (R. at 224.) He complained of shortness of breath and yellowish green sputum. (R. at 224.) Childress was discharged on March 3, 1999. (R. at 224.) The discharge diagnosis was acute bronchitis and acute sinusitis. (R. at 224.)

Childress was next seen at Dr. Patel's office on March 11, 1999, where he complained of recurrent headaches and dizziness. (R. at 220.) Dr. Patel's impression was Childress suffered from chronic migraines or tension headaches, chronic dizziness related to vascular headaches, chronic polyarthralgia and chronic anxiety disorder with chronic insomnia. (R. at 220.)

On April 13, 1999, Dr. Tushar G. Patel, M.D. administered a pulmonary function test on Childress. (R. at 233.) The result was normal spirometry. (R. at 233.)

Dr. David L. Forester, M.D., board certified psychiatrist, saw Childress on April 20, 1999. (R. at 231.) A mental status exam, ("MSE"), was administered. (R. at 231.) Dr. Forester noted that Childress's appearance was careless, his affect was appropriate and his general knowledge was intact. (R. at 231.)

-10-

R.J. Milan, Jr., Ph.D., state agency psychologist, filled out a Psychiatric Review Technique form, ("PRFT"), regarding Childress on May 4, 1999. (R. at 241-50.) He found that Childress had a slight degree of limitation in regard to activities of daily living due to Childress's anxiety-related disorder. (R. at 249.)

On May 6, 1999, Childress was seen by Dr. Forester. (R. at 230.) Childress was there for an individual therapy. (R. at 230.) Dr. Forester diagnosed Childress with major depression and generalized anxiety. (R. at 230.)

An abdominal sonogram and CT scan, with and without contrast, was performed on Childress at Clinch Valley Medical Center on May 14, 1999. (R. at 339, 340-41.) The impression from the sonogram was that Childress had several hypoechoic poorly defined structures within the liver and increased heterogenous apperance of the liver as compared to the December 1995 study. (R. at 339.) Also, a hypoechoic structure with a thin septation was seen in the right side of the abdomen. (R. at 339.) The impression from the CT scan was a few tiny low-attenuation areas on the liver; however, Childress's liver had a more normal apperance on the CT scan as compared to the sonogram. (R. at 341.) Also a two centimeter, low-attunation area in the right kidney was revealed. (R. at 341.)

Dr. Patel treated Childress on May 25, 1999. (R. at 219.) Childress was again complaining of headaches with associated nausea. (R. t 219.) Dr. Patel's impression was unchanged from the previous visit. (R. at 219.)

On May 14, 1999, Childress presented with right-sided abdominal pain at

-11-

Clinch Valley Medical Center. (R. at 196.) An abdominal sonogram was performed. (R. at 196.) The sonogram findings were small poorly defined hypoechoic areas in the liver that did not appear to be cysts. (R. at 196.) A hypoechoic structure with a thin septation was seen in the right side of his liver. (R. at 196-97.) A CT scan with and without contrast also was performed. (R. at 198-99.) The CT scan impression was few tiny low attenuation areas in the liver and approximately two centimeters low-attenuation area in the right kidney. (R. at 198-99.)

Dr. Jeffrey S. Levine, M.D., treated Childress on June 3, 1999. (R. at 258.) Childress presented with right upper quadrant pain and abnormal liver function tests. (R. at 257.) Dr. Levine's impression was right upper quadrant pain, abnormal liver lesions and gastroesophageal reflux disease, ("GERD"). (R. at 258-59.) Dr. Levine also noted that Childress could have biliary dyskinesia[2] with the abnormal ejection fractions. (R. at 258.)

Dr. Forester treated Childress on June 8, 1999. (R. at 274.) The only change from previous visits was that Dr. Forester did not note that Childress was suffering from anxiety or depression. (R. at 274.)

Dr. Modi filled out a medical assessment form regarding Childress on June 10, 1999. (R. at 212-14.) Dr. Modi determined that Childress could not lift or carry objects weighting more than five pounds. (R. at 212.) He made this determination

_____

[2] A condition that occurs after gallbladder removal. The muscle between the gallbladder and the small intestine does not work properly, causing pain, nausea and indigestion.

-12-

based on Childress's shortness of breath, ("SOB"), chest pain, low back pain and dizziness. (R. at 212.) Dr. Modi found that Childress could stand, walk or sit for only one hour due to dizziness, headaches and low back pain. (R. at 212-13.) Childress, according to Dr. Modi, could never climb, balance, stoop, crouch, kneel, or crawl. (R. at 213.) Dr. Modi determined that Childress's ability to reach, handle, push and pull were also affected by his impairments. (R. at 213.) He further found that Childress had the following environment limitations: heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 214.) Dr. Modi based his environmental restrictions on Childress's SOB, chest pain, low back pain and dizziness. (R. at 214.)

Childress presented to Dr. Levine with right upper quadrant abdominal pain on June 17, 1999. (R. at 255.) Dr. Levine's impression was right upper quadrant abdominal pain, abnormal liver lesions and GERD. (R. at 255.) He also noted that Childress's discomfort was possibly due to biliary dyskinesia. (R. at 255.)

On July 2, 1999, per request of Dr. Levine, Childress underwent a CT scan of his abdomen. (R. at 254.) A right renal cyst was noted, and the CT scan was otherwise negative. (R. at 254.)

Dr. Levine next treated Childress on July 16, 1999. (R. at 252.) Childress again complained of right upper quadrant abdominal pain. (R. at 252.) Dr. Levine again reiterated that he believed that Childress could possibly be suffering from dyskinesia. (R. at 252.)

-13-

On July 20, 1999, Childress was seen by Dr. Forester. (R. at 273.) Childress complained that Buspar was not effective in treating his depression. (R. at 273.) Dr. Forester noted that Childress suffered from major depression and generalized anxiety and prescribed Paxil. (R. at 273.)

Childress was seen by Dr. Patel on August 25, 1999, for a follow-up appointment. (R. at 266.) Childress's chief complaint was recurrent headaches and polyarthralgia. (R. at 266.) Dr. Patel's impression was unchanged from Childress's last appointment; however, he noted that Childress said he believed he was improving. (R. at 266.)

On September 13, 1999, and October 11, 1999, Childress was seen by Dr. Forester. (R. at 272, 269.) There was no change in Dr. Forester's assessment in regard to Childress's anxiety and depression. (R. at 272, 269.)

Dr. Levine treated Childress on November 5, 1999, for complaints of right upper quadrant pain. (R. at 328-29.) Dr. Levine noted right upper quadrant tenderness, especially with inspiration and no masses were detected. (R. at 328.) An esophagogastroduodenoscopy, ("EGD"), was scheduled. (R. at 329.) Childress underwent an EGD at Wellmont Bristol Regional Medical Center, ("BRMC"), on November 16, 1999. (R. at 333-34.) It was noted that the EGD was normal with mild laryngeal erythema, and there was no indication as to the cause of Childress's right upper quadrant pain. (R. at 333.)

-14-

Childress was seen by Dr. Patel on November 17, 1999. (R. at 325.) He reported chronic, recurrent, diffuse, pressure type headaches to Dr. Patel. (R. at 325.) He also complained of chronic burning sensations on the back of his neck and head. (R. at 325.) Dr. Patel's impression of Childress was chronic migraine/tension headaches, polyarthalgia and anxiety/depressive disorder. (R. at 325.)

Childress had his gallbladder removed at BRMC, on January 4, 2000. (R. at 526-27.) The reason for the gallbladder removal was continued difficulties with right upper quadrant pain. (R. at 526.)

On January 28, 2000, Childress underwent x-rays of his cervical spine and lumbar spine. (R. at 402-03.) His cervical spine was normal, and there was no evidence of fracture or subluxation. (R. at 402.) The impression from the lumbar spine x-ray was minimal rotary scoliosis. (R. at 403.)

Dr. German Iosif, M.D., state agency physician, performed a disability determination on Childress and filed a report dated January 31, 2000. (R. at 283.) Dr. Iosif's impression was Childress suffered from chronic migraine/tension headaches, chronic depression and anxiety disorder and abnormal liver function with uncertain etiology. ( R. at 286.) It was Dr. Iosif's opinion that Childress was not a viable candidate for long-term successful gainful employment. (R. at 286.)

Dr. Iosif also filled out a Medical Assessment of Ability To Do Work-Related

-15-

Activities (Physical), on January 31, 2000. (R. at 289-91.) He determined that Childress's ability to lift, carry, stand and walk were not affected by his impairment. (R. at 289-90.) Dr. Iosif found that Childress retained the ability to climb, stoop, kneel, balance, crouch and crawl. (R. at 290.) He further found that Childress had the ability to reach, handle, feel, push, pull, see, hear and speak. (R. at 290.) However, Dr. Iosif placed environmental restrictions on Childress that included aviodance of heights and moving machinery. (R. at 291.)

Sharon J. Hughson, Ph.D., state agency psychologist, performed a psychological evaluation on Childress and filed a report dated January 31, 2000. (R. at 292-97.) Hughson performed several tests on Childress including the Wechsler Adult Intelligence Scale, Third Edition, ("WAIS-III"), the Wide Range Achievement Test-III, ("WRAT-III"), and the Minnesota Multiphasic Personality Inventory-2, ("MMPI-II"). (R. at 294-94.) Hughson observed that Childress had a WAIS-III full-scale IQ score of 76, with a verbal IQ score of 80 and a performance IQ of 76. (R. at 295.) On the WRAT-III, Childress scored in the 21st percentile in reading achievement, which placed him in the high school grade level equivalent. (R. at 295.) He scored in the 12th percentile in spelling achievement, which placed him in the sixth-grade level equivalent, and he scored in the 10th percentile in arithmetic achievement, which placed him in the sixth-grade level equivalent. (R. at 295.) Hughson noted that both of Childress's scores on the WAIS-III and WRAT-III were considered valid and reliable; however, Childress's score on the MMPI-II should be interpreted with caution. (R. at 295.) It was determined by Hughson that Childress had exaggerated his symptoms and, therefore, did not have a valid MMPI-II profile. (R. at 295.) Hughson determined that Childress was capable of managing his own

-16-

funds. (R. at 297.)

Hughson also filled out an Medical Assessment Of Ability To Do Work-Related Activities (Mental) dated January 31, 2000. (R. at 298-300.) Hughson determined that Childress had a fair ability to deal with the public, use appropriate judgment and function independently. (R. at 298.) She further found that Childress had a fair ability to understand and remember detailed job instructions and no ability to understand complex job instructions. (R. at 299.) Hughson indicated that Childress had a fair ability to behave in an emotionally stable manner and relate predictably in social situations, but he had no ability to demonstrate reliability. (R. at 299.)

Childress was seen by Dr. Patel on February 2, 2000. (R. at 324.) This was a follow-up appointment to treat his recurrent headaches and polyarthralgia. (R. at 324.) Childress told Dr. Patel that he continued to have chronic daily headaches, which he described as dull diffuse pressure type headaches. (R. at 324.) Dr. Patel's impression was unchanged from Childress's last visit. (R. at 324.)

On February 8, 2000, Childress went to Clinch Valley Medical Center complaining of dizziness, which had worsened over the previous two days. (R. at 371.) An electrocardiogram, ("EKG"), was performed and the results were normal. (R. at 376.)

-17-

On February 9, 2000, Childress presented to Dr. Patel with severe dizziness. (R. at 323.) Childress informed Dr. Patel that he had been experiencing dizziness for the past five days. (R. at 323.) Childress also noted tingling sensations around his mouth and on both sides of his face. (R .at 323.) Dr. Patel believed Childress's dizziness to be caused by benign positional vertigo or symptoms from vestibular neuronitis. (R. at 322.) Dr. Patel further diagnosed Childress with chronic migraines and chronic anxiety and depression. (R. at 323.)

Childress went to Clinch Valley Medical Center on February 13, 2000, and presented dizziness and numbness in his fingers. (R. at 361-62.) An EKG was performed, and the results were normal. (R. at 366.) A brain MRI, with and without contrast, was performed on Childress on February 14, 2000, at Clinch Valley Medical Center. (R. at 381.) The impression was normal intra-calvarial contents and evidence for right maxillary sinusitis, which was unchanged since October 1, 1998. (R. at 381.)

Childress was seen by Dr. Patel for a follow-up appointment for recurrent headaches and dizziness on March 8, 2000. (R. at 322.) Dr. Patel's impression was chronic migraine/tension headaches, with possible daily headaches as a result of analgesic overuse, and recurrent dizziness and chronic anxiety-depressive disorder. (R. at 322.)

Dr. David L. Forester, M.D., sent a letter dated April 8, 2000, to Gene Cochran, Childress's attorney at that time, regarding Dr. Forester's psychiatric treatment of

Childress. (R. at 345-49.) Dr. Forester said that he had been treating Childress monthly for approximately one year. (R. at 345.) He indicated that Childress's treatment course had become progressively more aggressive. (R. at 345.) Dr. Forester noted that Childress presented symptoms consistent with generalized anxiety disorder, major depression and social phobias, and Childress had reported to Dr. Forester intermittent vague hallucinations, which Dr. Forester believed suggested the presence of a psychotic diathesis. (R. at 345.) Dr. Forester also determined that Childress met the criteria for a major depressive episode. (R. at 346.) Dr. Forester's impression of Childress was that he suffered from an anxiety disorder, and he met the requirements for major depressive disorder and social phobias. (R. at 349.) Further, Dr. Forester believed that Childress's symptoms would last longer than 12 months. (R. at 349.)

Childress was seen by Dr. Levine on April 12, 2000. (R. at 326.) He presented to Dr. Levine right upper quadrant pain. (R. at 326.) Dr. Levine's impression was right upper quadrant pain, GERD, rectal bleeding and guaiac positive stools. (R. at 327.) Dr. Levine scheduled a colonoscopy. (R. at 327.) A colonoscopy with a biopsy was performed on Childress at BRMC, on April 18, 2000. (R. at 331-32, 530-32.) The postoperative diagnosis was a normal colonoscopy with no indication that would explain Childress's right upper quadrant pain. (R. at 331.)

Dr. Levine filed out a Medical Assessment Of Ability To Do Work-Related Activities (Physical) regarding Childress on May 5, 2000. (R. at 342-44.) Dr. Levine indicated that Childress's ability to lift/carry was affected by his condition,

in that, Childress could lift and or carry items weighing only five to 10 pounds because of his chronic right quadrant pain. (R. at 342.) Dr. Levine further indicated that Childress's ability to stand and walk were affected and that Childress could only stand and or walk for only 30 minutes without interruption. (R. at 342.) Dr. Levine opined that Childress's impairment had no effect on his ability to sit. (R. at 343.) He also indicated that Childress could never climb, but Childress could occasionally stoop, kneel, balance, crouch and crawl. (R. at 343.) Further, Dr. Levine indicated that Childress's ability to push and or pull was affected by his impairment because a pushing/pulling motion caused Childress to suffer increased pain. (R. at 343.) Dr. Levine noted that Childress's physical limitations were primarily due to chronic right upper quadrant pain. (R. at 343.)

Dr. Modi filled out a Physical Capacities Evaluation regarding Childress, date unknown. (R. at 418.) He found that Childress could sit, stand and walk for only one hour at a time, during an eight-hour workday. (R. at 418.) Dr. Modi further found that Childress could sit, stand and walk for a total of only one hour, during an eight-hour work day. (R. at 418.) Dr. Modi determined that Childress could lift and/or carry items weighing up to only five pounds occasionally and could never lift and/or carry items weighing more than six pounds. (R. at 418.) He further found that Childress could not use his hands for simple grasping, and he could not use his legs for pushing or pulling leg controls. (R. at 418.) Dr. Modi found that Childress was incapable of performing activities involving unprotected heights, moving machinery, marked changes in temperature and humidity, driving automobile equipment and exposure to dust, fumes and gases. (R. at 418.)

-20-

From May 5, 2000, until April 3, 2001, Childress consistently presented to Dr. Levine's office complaining of abdominal pain and right upper quadrant pain. (R. at 421-33.) Dr. Levine's impression was that Childress suffered from right upper quadrant pain and pancreatitis. (R. at 421-23.) Dr. Levine noted that there had been little change in Childress's right upper quadrant pain since the removal of his gallbladder. (R. at 432-33.)

A Physical Residual Functional Capacity Assessment was filled out by an unknown state agency physician on November 11, 2000. (R. at 468-74.) According to the form, Childress had no exertional limitations, no manipulative limitations, no visual limitations, no communicative limitations and no environmental limitations. (R. at 469-72.)

On August 2, 2000, Childress was seen by Dr. Malcolm S. Branch, M.D., at the Duke University Medical Center. (R. at 460.) Childress was referred to Dr. Branch by Dr. Levine. (R. at 460.) Dr. Branch diagnosed Childress with right upper quadrant pain. (R. at 460.) Childress was seen by Dr. Branch on October 9, 2001. (R. at 446-48.) Dr. Branch noted that Childress was chronically ill and appeared much older than his actual age. (R. at 446.) Dr. Branch's impression was that Childress suffered from chronic pancreatitis with associated chronic pain syndrome. (R. at 447.) However, at the charge of Dr. Branch, an endoscopy was performed on Childress, and the impression was that there was no evidence of chronic pancreatitis. (R. at 454-55.)

Hugh Tenison, Ph.D., state agency psychologist, filled out a PRTF regarding

-21-

Childress on March 26, 2001. (R. at 476-88.) Tenison noted that Childress had non-severe anxiety related disorder. (R. at 476.) Tenison noted that Childress had one functional limitation, which was that he suffered from a mild degree of limitation in the area of maintaining concentration, persistence or pace. (R. at 486.)

In a letter from Dr. Branch to Dr. Levine, Dr. Branch informed Dr. Levine of the results of an endoscopy which was performed on Childress on May 9, 2001. (R. at 491.) The impression from the endoscopy was mild chronic pancreatitis but otherwise unremarkable. (R. at 491.)

On May 17, 2001, Childress was seen at BRMC's emergency room. (R. at 540-46.) He complained of abdomen pain, nausea, vomiting and diarrhea. (R. at 541.) The diagnosis was Childress suffered from abdominal pain and a history of recent endoscopic retrograde cholangiopancreatography, ("ERCP"), with pancreatitis. (R. at 542.)

A Physical Residual Functional Capacity Assessment was filled out by an unknown state agency physician on June 5, 2001. (R. at 494-502.) Childress was found to be capable of lifting items weighing up to 20 pounds occasionally and lift items weighing up to 10 pounds frequently. (R. at 495.) Childress could stand and/or walk for at least two hours in an eight-hour workday, and he could sit with normal breaks for a total of six hours in an eight-hour workday. (R. at 495.) Furthermore, his ability to push and or pull would be limited because of pain. (R. at 495.) Also, it was found that Childress's allegations of pain were partially credible, and the pain

-22-

could make it difficult for him to work. (R. at 497.) It was determined that Childress could occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs, but he could never climb a ladder, rope or scaffold. (R. at 498.) Also, Childress had no manipulative, visual, communicative or environmental limitations. (R. at 499-500.)

A Mental Residual Functional Capacity Assessment was completed by Howard Leizer, Ph.D., state agency psychologist, regarding Childress on June 5, 2001. (R. at 518-23.) Leizer found that Childress was moderately limited in his ability to understand and remember, his ability to carry out detailed instructions and his ability to perform activities within a schedule and maintain regular attendance and be punctual within customary tolerances. (R. at 518.) He further found Childress moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, in his ability to perform at a consistent pace without an unreasonable number and length of rest periods, in his ability to respond appropriately to changes in the work setting and in his ability to set realistic goals or make plans independently of others. (R. at 519.)

Leizer completed a PRFT regarding Childress, which covered the treatment period from November 3, 2000, through August 5, 2001. (R. at 504-17.) Leizer's medical dispositions were based on categories that included affective disorders and anxiety-related disorders. (R. at 504.) Leizer found that Childress suffered from the medically determinable impairments of depression and anxiety, and these impairments did not precisely satisfy the listed diagnostic criteria on the PRFT. (R.

-23-

at 507, 509.) Leizer found that Childress had a mild degree of limitation in his activities of daily living and maintaining social functioning. (R. at 514.) He further found that Childress had a moderate degree of limitation in his ability to maintain concentration, persistence and pace. (R. at 514.)

A CT scan of Childress's abdomen was performed on May 29, 2002, at Dr. Modi's request. (R. at 434.) The impression was a small lesion off the posterior aspect of the pancreas, which was the same as previous scans but possibly increased in size from the December 19, 2001, study. (R. at 434.) Also, there was no change from the previous studies dated August 29, 2001, July 17, 2001, June 14, 2001, March 5, 2001 and July 2, 1999, all of which noted two or three tiny low density areas in the liver most likely representing small hepatic cysts. (R. at 438-44)

Childress was admitted to Clinch Valley Medical Center on February 27, 2002. (R. at 547-68.) He was discharged on February 28, 2002. (R. at 547.) X-rays were taken of Childress's abdomen, and they were normal. (R. at 57-59.) The discharge diagnosis was acute chest pain, acute abdominal pain secondary to acute gastritis, history of chronic pancreatitis, chronic obstructive pulmonary disease, ("COPD"), acute bronchitis and cystic lesions in the liver and kidneys. (R. at 548.)

On March 27, 2002, Childress was seen by Dr. Levine. (R. at 594-95.) Childress complained of chronic pancreatitis. (R. at 594.) Dr. Levine's impression was chronic pancreatitis and pain. (R. at 595.) It also was noted in the record that the

etiology of his pancreatitis was unknown. (R. at 594.) Childress was again at Dr. Levine's office on May 22, 2002. (R. at 592-93.) His chief complaint was chronic pancreatitis. (R. at 592.) It was noted that his weight had been stable. (R. at 592.) Dr. Levine's impression was chronic pancreatitis, pain and shortness of breath. (R. at 593.) On September 4, 2002, Childress returned to Dr. Levine's office and complained of chronic pancreatitis. (R. at 590-91.) After a general exam was performed, Dr. Levine's impression was chronic pancreatitis. (R. at 591.) Childress presented chronic pancreatitis, diarrhea and abdominal pain to Dr. Levine on October 23, 2002. (R. at 588-89.) Dr. Levine's impression was that Childress was suffering from chronic pancreatitis, increased diarrhea and abdominal pain. (R. at 589.) Childress returned to Dr. Levine's office on January 29, 2003, and his chief complaint was chronic pancreatitis. (R. at 613-14.) Dr. Levine's impression was chronic pancreatitis. (R. at 613.)


B. Wayne Lanthorn, Ph.D., examined Childress on April 1, 2003, and April 8, 2003, and listed his findings in a report dated April 15, 2003. (R. at 615-21.) During the examination, Lanthorn administered a Mental Status Evaluation, ("MSE"), the Miller Forensic Assessment of Symptoms Test, ("M-FAST"), and the MMPI-II. (R. at 615.) Childress had a M-FAST score of 4. (R. at 619.) Childress's MMPI-II scores indicated that he suffered from depression, unhappiness and pessimism about the future, and he was quite self-critical. (R. at 619.) Lanthorn diagnosed Childress with a major depressive disorder, generalized anxiety disorder and chronic pain. (R. at 620.) Lanthorn noted he believed Childress's test results were reliable. (R. at 621.)

-25-

Lanthorn also completed a Medical Assessment Of Ability To Do Work Related Activities on April 8, 2003. (R. at 622-24.) In the area of making occupational adjustments, Lanthorn determined that Childress had a poor ability to follow work rules, relate to co-workers, interact with supervisors, function independently, maintain attention/concentration and use judgment, while he had no ability to deal with the public and deal with work stresses. (R. at 622-23.) In the area of making performance adjustments, Lanthorn determined that Childress had a poor ability to understand, remember and carry out complex job instructions, a fair ability to understand, remember and carry out detailed but not complex job instructions and a good ability to understand, remember and carry out simple job instructions. (R. at 623.) And, in the area of making occupational adjustments, Lanthorn found that Childress had a poor ability to behave in an emotionally stable manner and relate predictably in social situations, while he had a fair ability to maintain his personal appearance, and he had no ability to demonstrate reliability. (R. at 623.)

From July 16, 2003, to July 22, 2003, Childress was evaluated by Dr. D.M. Aguirre, M.D. (R. at 625-28.) Childress was referred to Dr. Aguirre by Dr. Levine. (R. at 625.) Dr. Aguirre performed a level four detailed examination to evaluate Childress's pain. (R. at 625.) Dr. Aguirre determined that Childress suffered from chronic pancreatitis with pseudocyst, and it was advisable to increase Childress's dosage of OxyContin. (R. at 625.)

Tonya McFadden, M.A., examined Childress on December 12, 2003, and listed her findings in a report dated December 30, 2003, for the Virginia Department of

-26-

Rehabilitative Services. (R. at 632-40.)   During the examination, McFadden administered the M-FAST, WAIS-III, the Million Clinical Multiaxial Inventory III, ("MMPI-III"), WRAT-3. The WAIS-III results demonstrated that Childress had a verbal IQ of 68, a performance IQ of 69 and a full-scale IQ of 66; however, these results were considered invalid because during the test Childress gave up easily and presented inconsistent effort levels. (R. at 636-37.) Also, his M-FAST scores were elevated and McFadden believed this to be evidence of malingering. (R. at 638.) Childress's scores on the WRAT-III placed him in the 13th percentile in reading, the 25th percentile in spelling and the ninth percentile in math. (R. at 639.) McFadden determined that Childress could perform simple and repetitive tasks. (R. at 639.)

McFadden also filled out a Medical Assessment of Ability To Do Work Related Activities, (Mental), regarding Childress.   (R. at 641-42.)   McFadden determined that Childress had a fair ability to follow work rules, relate to co-workers, interact with supervisors, maintain attention/concentration and function independently, while he had a poor ability to deal with the public, use judgment and deal with work stresses. (R. at 641.) McFadden found that Childress had a good ability to understand, remember and carry out simple job instructions and maintain personal appearance. (R. at 642.) She also noted that Childress had a poor ability to behave in an emotionally stable manner and demonstrate reliability. (R. at 642.)

Childress was seen by Dr. Levine on April 23, 2003. (R. at 660-61.) He was diagnosed with chronic pancreatitis. (R. at 660.) Dr. Levine noted that Childress's symptomology had not changed or improved and that going forward surgery might

-27-

be a possibility if he could not otherwise find pain relief. (R. at 661.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-28-

In his opinion dated May 14, 2004, the ALJ that Childress had an impairment or a combination of impairments considered "severe" based on the requirements of 20 C.F.R. §§ 404.1520(c) and 416.920(c). (R. at 34.) However, the ALJ found that Childress did not have a medically determinable impairment that met or medically equaled one of the listed impairments found in 20 C.F.R. Appendix 1, Subpart P, Regulation No. 4. (R. at 34.) The ALJ found Childress's allegations only partially credible. (R. at 34.) After carefully considering all of the medical opinions in the record regarding the severity of Childress's impairments, the ALJ determined that Childress had the residual functional capacity for simple, repetitive, light exertional work that did not require lifting objects weighing greater than 20 pounds occasionally and 10 pounds frequently. (R. at 34.) The ALJ, thus, concluded, that Childress had the residual functional capacity to perform a significant range of light work. (R. at 34.) The ALJ found that Childress was capable of performing his past relevant work as a molding machine operator and there also were numerous other jobs in the national economy that Childress was capable of performing. (R. at 34.)

Childress argues in his Brief In Support of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), (Docket Item No. 10), that the ALJ's decision is not supported by substantial evidence. Specifically, Childress argues that the ALJ erred in determining his residual functional capacity. (Plaintiff's Brief at 16.) Childress also argues that the ALJ erred by determining that he did not suffer from a severe mental impairment. (Plaintiff's Brief at 17.) Finally, Childress argues that the ALJ erred by giving greater evidentiary weight to a nonexamining medical expert as opposed to the evidence of a treating and examining expert. (Plaintiff's Brief at 18.)

-29-

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to subsititue its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays,* 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *See King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record support his findings.

Childress's first argument is that the ALJ erred in determining his residual functioning capacity. Specifically, Childress argues that the ALJ erred by disregarding his mental impairments and ignoring Lanthorn's and McFadden's mental assessments of Childress. This arguement is without merit. The ALJ has a duty to

weigh the evidence, and this duty has been met. *See Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984.). The ALJ discussed both Lanthorn's and McFadden's diagnoses and assessments at length and determined that they were inconsistent with other evidence in the record.

Schacht testified at Childress's hearing and noted that in the most recent consultative examination it was noted that Childress was malingering. (R. at 721.) Schacht further noted that Lanthorn's IQ examination resulted in an unexplainable 10-point drop from the previous examination. (R. at 721.) The ALJ noted in his opinion that Lanthorn's own report stated that Childress's profile should be interpreted with caution. (R. at 24, 28.) The ALJ stated that Lanthorn based his opinions on Childress's complaints and not on his history of conservative medical treatment. (R. at 30.) Schacht also questioned the credibility of McFadden's consultative exam because Childress scored an eight on the M-FAST, which was strong evidence of malingering. (R. at 28.) Thus, the ALJ determined that Lanthorn's and McFadden's test results were not credible, and instead adopted Schacht's findings, which were that Childress was capable of performing simple, repetitive jobs. (R. 28.)

Childress next argues that the ALJ erred by finding that he did not suffer from a severe mental impairment other than borderline intellectual functioning. As previously noted, the ALJ adopted the testimony of Schacht and found Lanthorn's and McFadden's consultive examinations unreliable. (R. at 30.) The ALJ determined that Childress functions in the low borderline range of intelligence, despite WRAT-III

-31-

testing that demonstrated Childress achieved a standard score of 83 in reading, which was equivalent to a high school level; a 90 in spelling, which was equivalent to a high school level; and an 80 in reading, which was equivalent to a sixth-grade level. (R. at 31.) It is clear from the record that the ALJ gave Childress every benefit of doubt when he determined that Childress functions in the low borderline range of intelligence.

Childress's final argument is that the ALJ erred by giving more weight to a nonexamining medical expert as opposed to an examining medical expert. However, this argument also holds no merit. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker,* 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician becuase that physicain is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight'" *Craig v. Chater,* 76 F.3d 585, 590 (4th Cir. 1996). (quoting *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig,* 76 F.3d at 590. "[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker,* 795 F.2d 343, 346 (4th Cir. 1986.)

-32-

As previously stated, the ALJ determined that Lanthorn and McFadden's consultative examinations were not consistent with other substantial objective medical evidence in the record. Therefore, the ALJ did not err when he determined that that Childress had the residual functioning capacity to perform simple, repetitive light exertional work that did not require lifting objects weighing greater than 20 pounds occasionally and 10 pounds frequently. (R. at 32.) There is simply nothing in the record that would contradict this finding. Furthermore, the ALJ properly relied on the testimony of Dr. Griffin and Schacht because their testimony was consistent with the medical record. Therefore, the ALJ's decision that Childress is not disabled is supported by substantial evidence.

## V. Conclusion

Based on the above, I will sustain the Commissioner's motion for summary judgment and decision denying benefits, and I will overrule Childress's motion for summary judgment.

An appropriate order will be entered.

DATED:   This 23 day of June, 2006.

SENIOR UNITED STATES DISTRICT JUDGE

-34-